Filed 5/9/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOCKAWAY STORAGE et al.,<br><br>   Plaintiffs and Respondents,<br><br>v.<br><br>COUNTY OF ALAMEDA et al.,<br><br>   Defendants and Appellants. | A130874, A132768<br><br>(Alameda County<br>Super. Ct. No. HG 03 091201) |

## I. INTRODUCTION

The County of Alameda (County) determined that an amendment to its General Plan adopted by voters as Measure D prohibited Lockaway Storage et al., from completing a project to develop a self-storage facility in the County. Lockaway sued for inverse condemnation and civil rights violations. After issuing a writ of mandate that authorized the project to proceed, the superior court conducted a nonjury trial which resulted in a judgment holding the County liable for a temporary regulatory taking and awarding Lockaway damages of $989,640.96. Pursuant to a separate order, the court awarded Lockaway attorney fees totaling $728,015.50.

The County appeals both the judgment and the attorney fee order. It contends the judgment must be reversed because (1) Lockaway's development plan violated Measure D; and (2) even if the court correctly allowed Lockaway to proceed with the project, the County's conduct did not effect a regulatory taking. The County also contends that if the judgment is affirmed, the trial court erred by awarding Lockaway attorney fees for work that was irrelevant or unnecessary to its inverse condemnation claim.

We conclude that the trial court was correct to rule that Lockaway's project was unaffected by the passage of Measure D. The County's change of position, almost two

1

years after Measure D was implemented, was an unreasonable and unjust interpretation of the measure that effectuated a regulatory taking. The basis for the award of attorney fees is easily discerned from the record and was reasonably within the scope of the trial court's discretion. Thus, we affirm.

## II. STATEMENT OF FACTS

### A.    *The Property*

Lockaway's property is an 8.45-acre parcel of land in an unincorporated area of Alameda County between Castro Valley and the City of Dublin. Located on the frontage road to Interstate 580, the property was used by Caltrans during highway construction and then for several years functioned as a public dump.

In 1989, the County Board of Supervisors approved an ordinance zoning the property for "agricultural" use with an alternative conditional use for "open storage of recreational vehicles and boats." Over the next 10 years, the County approved several Conditional Use Permits (CUP's) for vehicle storage on the property which expired without development. In 1999, the County approved another CUP for the property authorizing a storage facility for recreational vehicles and boats (the 1999 CUP). The 1999 CUP required that it be implemented within three years of issuance, or it would terminate on September 22, 2002.

In May 2000, Lockaway entered into a contract to purchase the property for $800,000. Lockaway, a general partnership that develops, owns and operates storage facilities, intended to implement the 1999 CUP to develop a boat and RV self-storage facility. Before Lockaway closed escrow, its general partner Michael Garrity met with County Zoning Administrator Darryl Gray, who confirmed that the property could be used as Lockaway intended. When escrow closed in August 2000, Lockaway assumed the rights and obligations of the seller in the 1999 CUP.

2

**B.** *Measure D*

In November 2000, Alameda County voters enacted Measure D, a growth control initiative which became effective on December 22 of that year. Among other things, Measure D generally prohibits the development of a storage facility in the area of Lockaway's property, except by public vote. Furthermore, Section 19, subdivision (c) of the measure states in part: "Except as required by state law, no subdivision map, development agreement, development plan, use permit, variance or any other discretionary administrative or quasi-administrative action which is inconsistent with this ordinance may be granted, approved, or taken."

Notwithstanding Section 19, two other sections of Measure D limit its application. One is Section 3, titled "Protection of Legal Rights," which states: "Notwithstanding their literal terms, the provisions of this ordinance do not apply to the extent, but only to the extent, that courts determine that if they were applied they would deprive any person of constitutional or statutory rights or privileges, or otherwise be inconsistent with the United States or State constitutions or law. The purpose of this provision is to make certain that this ordinance does not violate any person's constitutional or legal rights. [¶] To the extent that a provision or provisions of this ordinance do not apply because of this section, then only the minimum development required by law which is most consistent with the provisions and purposes of this ordinance shall be permitted."

The other is Section 22, titled "Application," which provides: "(a) This ordinance does not affect existing parcels, development, structures, and uses that are legal at the time it becomes effective. However, structures may not be enlarged or altered and uses expanded or changed inconsistent with this ordinance, except as authorized by State law. [¶] (b) Except to the extent there is a legal right to development, the restrictions and requirements imposed by this ordinance shall apply to development or proposed development which has not received all necessary discretionary County and other approvals and permits prior to the effective date of the ordinance."

## C.    *The Lockaway Project*

Even after Measure D became effective, Lockaway pursued its plan to develop the property and continued its dialogue with County Administrator Gray and other members of County staff.  Gray testified at trial that he never told any Lockaway representative that Measure D's use restrictions applied to the Lockaway project.  By the end of 2000, Lockaway had expended approximately $70,000 on project consultants and architects.

In February 2002, Lockaway applied for a grading permit.  The County deemed the application incomplete and specified additional requirements and fees.  Lockaway went to work to meet the County's requirements.

In July 2002, Lockaway project manager David Michael and construction manager Gary Brown met with Phil Kubicek from the County's planning department.  Gray participated in the meeting by telephone.  During the meeting, both Gray and Kubicek acknowledged that Lockaway had already implemented the 1999 CUP.  Gray also said that if the grading and building permits were not issued by the CUP's September 22 expiration date, he would prepare a formal letter stating that the CUP had been implemented.  At trial, Gray denied making these assurances.  However, the trial court expressly found that Gray's testimony "in this regard, like his testimony on several other material points, lacks credibility."

On August 30, 2002, Gray informed Michael that unless Lockaway obtained a new CUP, it could not proceed with its project after the 1999 CUP terminated on September 22.  That same day, Michael prepared a written request for an extension of the 1999 CUP and personally delivered it to Gray and other County staff associated with the project.  His request referenced Gray's assurances during their July 2002 meeting.  In response, Lockaway was informed it could not renew its permit, but had to apply for a new one.  By that time, Lockaway had spent approximately $400,000 on its project, in addition to the property's $800,000 purchase price.

4

**D.**    *Lockaway's Application for a New CUP*

Lockaway applied for the new CUP under protest on September 3, 2002.  On September 19, the County issued a grading permit.  But the County did not issue a building permit for the project prior to the September 22, 2002, termination date of the 1999 CUP.

The Castro Valley Municipal Advisory Council (Advisory Council) conducted a hearing on September 23, 2002, to consider Lockaway's application for the new CUP. Both Gray and County Counsel Lorenzo Chambliss expressed the opinion that the Lockaway project was prohibited under Measure D.  The County took the position that Measure D applied to the project because Lockaway had not obtained a building permit and commenced construction prior to Measure D's December 22, 2000, effective date. No mention was made of the possible effect of either Sections 19 or 22 on Lockaway's right to proceed with the project.

Lockaway argued that its right to complete the project was unaffected by Measure D because the 1999 CUP was implemented before it expired.  To support this contention, Lockaway relied on evidence demonstrating the substantial work it had done on the project and on Gray's assurances that the 1999 CUP had been implemented.  Several members of the Advisory Council expressed concern that the County had mishandled the project and that it would be unfair to deny Lockaway's application even though it conflicted with Measure D.[1]  Ultimately, the Advisory Council voted 5-to-1 to recommend approval of Lockaway's application for a new CUP.

On October 9, 2002, the West County Board of Zoning Adjustments considered the Advisory Council recommendation at a hearing.  The County's position remained that Lockaway's application should be denied pursuant to Measure D because Lockaway had

---

[1]  For example, when County counsel told the Advisory Council that in order to "survive" Measure D, a project had to have all of its permits before the measure went into effect, the Chair responded that if County staff "had proceeded in a timely manner and advised applicant the Council would not be having this discussion tonight.  Without the delays the applicant would not be here tonight."

5

not obtained a building permit and commenced construction prior to December 22, 2000. The Board of Zoning Adjustment rejected the Advisory Council's recommendation and denied Lockaway's application for a new CUP on the ground that it was inconsistent with the County's general plan as amended by Measure D.

On March 6, 2003, the County Board of Supervisors heard Lockaway's appeal of the Board of Zoning Adjustment's decision. The Board of Supervisors determined that the Lockaway project was subject to Measure D and affirmed the Board of Zoning Adjustment's decision to deny Lockaway's application for a new CUP. Thereafter, the County stopped the work on the project.

### E. *The Present Action*

On April 4, 2003, Lockaway filed its complaint against the County and others alleging causes of action for inverse condemnation and civil rights violations seeking damages, a writ of mandate and other equitable relief.

#### 1. *Pretrial Proceedings*

Lockaway's seventh cause of action sought a writ of mandate commanding the County to recognize that the 1999 CUP had vested, to recognize that Measure D did not apply to its project, and to allow construction of the project to proceed. The parties agreed this cause of action would be decided on cross-motions for summary adjudication pursuant to their stipulation of undisputed facts.

The motions were considered in November 2004. The County argued that the Lockaway project could not proceed because the 1999 CUP was issued pursuant to a zoning provision which was superseded by Measure D. According to the County, when Measure D took effect in December 2000, the zoning ordinance became ineffective and the 1999 CUP issued pursuant to that ordinance was also ineffective. Lockaway argued that its project was exempt from Measure D under Section 22 of the ordinance which states that it does "not affect existing parcels, development, structures, and uses that are legal at the time it becomes effective," and that the "restrictions and requirements imposed by this ordinance shall apply to development or proposed development which has not received all necessary discretionary County and other approvals and permits"

6

prior to the effective date of the measure. Lockaway argued that this "grandfather clause" applied to its project because it had obtained all necessary discretionary approvals from the County prior to Measure D's effective date.

On November 24, 2004, the superior court granted summary adjudication on the mandate cause of action in Lockaway's favor. The court found that Measure D did not apply to the Lockaway project because the undisputed facts established that the project was "squarely under the protections of Section 22 of Measure D." In reaching this conclusion, the court observed that, although the County had not yet issued Lockaway a building permit, the County conceded a building permit was ministerial. The court rejected the County's argument that Measure D voided both the 1999 CUP and the zoning ordinance pursuant to which that CUP was issued. The court determined that the County's argument was inconsistent with both the purpose of a grandfather clause and the plain language of Section 22.

On February 14, 2005, the superior court filed an order for issuance of a writ of mandate commanding the County to "recognize [the 1999 CUP] as a valid conditional use permit which is vested in Petitioners and to allow construction to proceed on Petitioners' property pursuant to said conditional use permit . . . ." The writ issued on February 28, 2005.

Initially, the County resisted complying with the writ and Lockaway initiated a contempt proceeding. In August 2005, the County issued the necessary permits so that Lockaway could complete its project.

During the lengthy pretrial period that followed, Lockaway settled its claims against the individual defendants in this case. Lockaway's remaining claims against the County were temporally divided into three "phases" consisting of Phase I claims arising prior to September 22, 2002, based on alleged delays during the permitting process; Phase II claims arising between September 22, 2002, and April 15, 2005, based on the County's application of Measure D to the Lockaway project; and Phase III claims arising after April 15, 2005, based on alleged delays in compliance with the writ of mandate. The parties settled the Phase I and Phase III claims prior to trial. Thus, the claims that

7

were considered at trial pertained exclusively to the period between September 22, 2002, and April 15, 2005, when the County prohibited work on the Lockaway project pursuant to Measure D.

## 2. *Trial*

Lockaway's damages claims against the County were tried in March 2009. The trial court issued its posttrial findings, conclusions and order on September 22. In its September 2009 order, the court found that the County's possible liability turned on the answers to two questions: "(1) Did Defendant's conduct amount to a temporary 'taking' under the Fifth Amendment to the US Constitution thereby requiring that Plaintiffs be compensated? (2) Did Defendant's conduct violate Plaintiffs' substantive due process rights?"

To answer the first question, the trial court applied a test articulated by the Supreme Court of the United States in *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 115-116 (*Penn Central*). Pursuant to that "*Penn Central* inquiry," the trial court found that the County's application of Measure D was a temporary regulatory taking making it liable in damages to Lockaway on its cause of action for inverse condemnation. The trial court supported its conclusion with extensive findings of fact including that the County's regulatory action had a "substantial, negative economic impact" on Lockaway's use of the property, had "materially interfered with Plaintiffs' distinct, investment-backed expectations," and that its conduct could not be justified as a normal regulatory mistake.

However, the trial court also rejected Lockaway's due process claim. The court reasoned that while the County's conduct was outside the realm of an inadvertent error or honest mistake, the County had not "deliberately flouted the law and trammeled significant property rights, thereby violating the substantive due process rights of Plaintiffs."

The damages phase was tried in April 2010. On September 14, 2010, the trial court filed its findings which awarded Lockaway $504,175 in lost profits, and $324,954 in increased construction costs due to the 30-month delay in construction during the

Phase II period. With the addition of prejudgment interest, Lockaway's damages on its inverse condemnation cause of action totaled $989,640.96.

### 3. *Judgment and Attorney Fees*

On November 15, 2010, the court filed a statement of decision which incorporated the September 2009 order on liability, and the September 2010 order on damages. Judgment was entered that same day.

Lockaway moved for its attorney fees pursuant to Code of Civil Procedure section 1036 (section 1036). Lockaway requested a lodestar award of $703,760 plus a 1.25 multiplier for a total award of $879,700. The trial court awarded Lockaway $703,760 (i.e., the lodestar amount without a multiplier), plus $24,255.50 for work on the attorney fee motion for a total award of $728,015.50.

## III. DISCUSSION

### A. *Measure D*

The County first claims that the trial court incorrectly interpreted and applied Measure D. According to the County, Measure D prohibited Lockaway from completing its project and the trial court was wrong to conclude that the project was exempted from Measure D's restrictions by Section 22. The County contends that this legal error undermines both the writ of mandate and the judgment for damages. Lockaway counters that any dispute regarding the propriety of the writ of mandate is moot and that, in any event, the trial court correctly interpreted and applied Section 22.

We will first address mootness and then consider whether the court's conclusion that the Lockaway project was exempt from the use restrictions of Measure D was correct.

### 1. *The Writ of Mandate*

When the trial court issued the writ of mandate directing the County to allow Lockaway to proceed with its project, the County did not seek a stay or any other extraordinary relief to maintain the status quo. Instead, it issued permits to allow the project to proceed, and Lockaway completed its project. Indeed, the County acknowledges that Lockaway "is now operating its facility," and it has been "open to the

public for years." Notwithstanding these undisputed facts, the County asks this court to reverse the writ of mandate. As we will explain, settled principles establish that the writ petition is no longer a justiciable controversy and, therefore, the County's purported appeal from the writ of mandate is moot.

"California courts will decide only justiciable controversies. [Citations.] The concept of justiciability is a tenet of common law jurisprudence and embodies '[t]he principle that courts will not entertain an action which is not founded on an actual controversy . . . .' [Citations.] Justiciability thus 'involves the intertwined criteria of ripeness and standing. A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.] But 'ripeness is not a static state' [citation], and a case that presents a true controversy at its inception becomes moot ' "if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character." ' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573 (*Wilson*).)

"The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief. [Citations.] If events have made such relief impracticable, the controversy has become 'overripe' and is therefore moot." (*Wilson, supra*, 191 Cal.App.4th at p. 1574.) By the same token, an appeal is moot if " 'the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief.' " (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1547 (*Baykeeper*).)

Applying these principles, we hold that the County's appeal from the writ of mandate is moot because the County has already fully complied with the writ and Lockaway has completed its project. Under these circumstances, we cannot provide any effective relief from the order commanding the County to allow the Lockaway project to proceed. Two recent decisions support our conclusion. (*Wilson, supra*, 191 Cal.App.4th 1559; *Baykeeper, supra*, 193 Cal.App.4th at p. 1547.)

10

In each case, a project was completed in spite of legal challenges. *Wilson, supra,* 191 Cal.App.4th 1559, was an action for declaratory relief. *Baykeeper, supra,* 193 Cal.App.4th 1538, was a mandate action challenging the approval of a project and environmental impact report. In both cases, completion of the projects during contested litigation rendered it moot. The County contends the cases are inapposite because in each of them, the plaintiff was seeking to stop a project, while here, the plaintiff Lockaway was seeking to complete one. We fail to see why such a distinction makes any difference to a proper mootness analysis. Lockaway's project is completed, and the County, as the project challenger, can obtain no effective relief on the writ.

The County argues that effective relief can indeed be entered in mandamus because Lockaway can always be forced to tear the project down. In so arguing, the County relies upon *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880. But there, a project was completed in the face of uncertainty created by the litigation over whether the lead government agency needed to prepare an environmental impact report. Rejecting arguments that the case was moot because the project was completed, the appellate court concluded that sound conceptions of public policy counseled against allowing a party to avoid the outcome of litigation by proceeding with development in ongoing litigation that led to a court order directing preparation of an environmental impact report. This case has no bearing on Lockaway's situation. In *Woodward Park* the developer was not allowed to moot litigation by completing a project in the face of legal challenges to its administrative approvals. Here, Lockaway's project was completed because a court order allowed it to proceed. The circumstances are starkly different, and there is no such public policy that warrants a departure from application of the mootness doctrine.

Finally, the County contends that there is a "possibility of effective relief" even though the project has been completed because "the award of damages is predicated on the rulings on summary adjudication, meaning a material question remains to be determined on appeal of the Writ." Under this theory, reversal of the writ would grant the County effective relief because it would undermine an essential premise of the

11

judgment for damages. Therefore, the County posits, a "material question remains" as to whether the County is liable for damages for a temporary taking.

This convoluted argument conflates mootness with one of three "discretionary" exceptions to the mootness doctrine which enables a court to review an issue otherwise moot "when a material question remains for the court's determination." (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 480.) This discretionary exception does not support the County's position. First, reversing the writ would not affect the County's liability for damages because the writ of mandate did not award Lockaway damages; it commanded the County to issue permits which have already been fully implemented. Relief from the damages award can be obtained, if at all, by appealing the judgment.

Second, whether the County is liable for damages is not a "material question" that remains for the court's determination. That question was answered by the trial court and its conclusions are embodied in the judgment, not the writ. Of course, the County has appealed from the judgment and, in the context of that appeal, we will review the trial court's finding that Measure D use restrictions did not apply to the Lockaway project. Thus, we are perplexed as to why the County has so aggressively sought reversal of the writ. An appeal of the writ is moot.

## 2. The *Section 22 Exemption*

The superior court found that the Lockaway project was exempt from application of Measure D pursuant to Section 22, which states in part: "[T]he restrictions and requirements imposed by this ordinance shall apply to development or proposed development which has not received all discretionary County and other approvals and permits prior to the effective date of the ordinance." The court found that Section 22 applied because Lockaway had received all discretionary approvals for its project before Measure D's effective date.

The County contends this finding cannot be affirmed. To support its position, the County proposes several interpretations of Section 22's exemption that would significantly limit its scope. Alternatively, the County argues that, even if the trial court

12

correctly interpreted the Section 22 exemption, that exemption did not apply to Lockaway under the facts of this case.

### a. *The Scope of the Section 22 Exemption*

The ordinary rules of statutory construction guide our effort to discern the meaning of Section 22. (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540 (*Lesher*).) "Basic to all statutory construction . . . is ascertaining and implementing the intent of the adopting body." (*Id*. at p. 543; see also *Save Our Sunol, Inc. v. Mission Valley Rock Co.* (2004) 124 Cal.App.4th 276, 280 (*Sunol*) ["Our task when interpreting an initiative is to effectuate the electorate's intent."].) "Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Lesher, supra,* 52 Cal.3d at p. 543.)

Our plain reading of Section 22 conveys the intent of the voters that certain projects are unaffected by the measure's passage. Subdivision (a) clearly means that legal uses at the time Measure D became effective remain legal, but may not be enlarged, altered or expanded in a way that is contrary to Measure D unless authorized by state law. Subdivision (b) means that projects that received all discretionary approvals prior to Measure D's effective date have a legal right to development because it applies only to those projects that have not received them. Together these subdivisions place two classes of land use beyond Measure D's reach—those legally existing, and those in some stage of development that had received all discretionary approvals before Measure D became effective.

### b. *The County's New Legal Theories*

The County proposes several alternative interpretations of Section 22 that were not raised in the trial court to support its decision to preclude Lockaway from completing its project. We will assume, in order to dispose of them, that the County may advance these brand new legal theories for the first time on appeal. Each of the County's alternatives

13

would require us to interpret Measure D to mean something not apparent from its plain, unambiguous language.

First, in accord with our plain reading of subdivision (a), the County recognizes that Section 22 is a "grandfather clause" that recognizes the legality of certain approvals that conflict with Measure D. By contrast, the County posits that subdivision (b) is not a grandfather clause because it exempts nothing. It does not expressly exempt a project. Instead, it describes one category of projects to which the restrictions *do apply*: those projects that have not received all "discretionary County and other approvals and permits."

To indulge this proposed interpretation, we would be required to nullify or ignore as surplus that part of subdivision (b) which is unfavorable to the County's position. The first phrase of subdivision (b) recognizes there are projects that have acquired a legal right to develop. The contours of that right turn on whether there are outstanding discretionary approvals. The two subdivisions of Section 22 can and should be construed together. By their plain language, they convey a single intention. Existing uses and development, whether categorized as existing or proposed, are beyond Measure D's reach if the developer acquired all discretionary permits from the County prior to its effective date.

The County argues that construing subdivision (b) to grandfather all "development or proposed development" that has received discretionary approval, would render subdivision (a) meaningless and superfluous because there would be no reason for subdivision (a) to exempt only "existing" parcels. Again, we disagree. Standing alone, subdivision (a) exempts "existing" developments, without defining the word "existing." But any potential ambiguity due to such a lack of definition is avoided by taking into account that subdivision (b) clarifies that any development, whether construed as proposed or existing, is exempt from Measure D if all discretionary permits were obtained before the measure's effective date. By acknowledging that subdivisions (a) and (b) are part of the same section and reading them together, we give meaning to the straightforward language in both subdivisions.

14

The County also contends that the second sentence of subdivision (a) which "explicitly states—without exception—that structures may not be 'enlarged or altered' and that uses may not be 'expanded or changed' inconsistent with Measure D," conflicts with the trial court's interpretation of subdivision (b). But the second sentence of subdivision (a) does not address development at all. It addresses structures and existing uses. Instead, development and proposed development are addressed in subdivision (b) which clarifies the scope of authorized development, whether existing or proposed.

The County's second new theory is that, if subdivision (b) is a grandfather clause, it establishes only a limited exemption. Comparing isolated phrases from Section 22, the County suggests that subdivision (a) broadly exempts existing developments while subdivision (b), exempts proposed developments only from the "the restrictions and requirements" imposed by Measure D. According to the County, Measure D did more than impose "restrictions and requirements," it also made changes to the County's general plan and zoning law which precluded the County from approving completion of the Lockaway project. Therefore, the County argues that, "[t]echnically speaking, this prohibition on the County's ability to approve further development of the Project was not simply a 'restriction' or 'requirement' 'imposed by' Measure D, but also was imposed by state law, since it is state law (not just Measure D) which requires the County to comply with its general plan and zoning ordinance."

There are a couple of problems with this convoluted theory. As we have already explained, subdivisions (a) and (b) are not two distinct rules. They are part of a single provision which limits the measure's application. Second, the County's narrow interpretation of the phrase "restrictions and requirements imposed by this ordinance" is at best illogical and self-serving. If, as the County contends, the subdivision (b) exemption from "restrictions and requirements imposed" by Measure D does not include the changes to the County general plan and zoning ordinance effectuated by Measure D, then subdivision (b) provides no exemption at all and the exception for a legal right to development is meaningless.

15

The County's third new theory is that, if subdivision (b) is a grandfather clause, it applies only to proposed development that has obtained all approvals and permits from the County before Measure D's effective date, including permits issued pursuant to ministerial duties. Subdivision (b) provides that Measure D applies to proposed development "which has not received all necessary discretionary County and other approvals and permits" prior to its effective date. The County argues that this "plain language" establishes that a proposed development is subject to Measure D when, as here, the developer did not obtain all discretionary *and* ministerial permits before Measure D went into effect.

This new twist on subdivision (b) is absurd. If, as the County now contends, the drafters intended to exempt from its scope only those projects that had obtained *all* County approvals and permits, they would have said so and not used the word "discretionary." Instead, the drafters placed "discretionary" where it modifies "County," and "other approvals and permits," so as to convey an intention to exempt developments that have obtained all "discretionary" approvals and permits, whether from the County or elsewhere, prior to the effective date of the measure.

This straightforward interpretation was not only employed by the trial court, it was expressly endorsed by the parties in their stipulation of undisputed facts. Furthermore, at the hearing on the summary adjudication motions, County counsel acknowledged that Section 22, subdivision (b) required only approvals for discretionary permits and, in this case those discretionary permits were obtained prior to Measure D's effective date. Finally, this interpretation of subdivision (b) is consistent with *Sunol, supra*, 124 Cal.App.4th 276, the only published case we have found which discusses the meaning of this provision, albeit in a different factual context.[2]

---

[2] *Sunol, supra*, 124 Cal.App.4th 276 involved a provision in Measure D referred to as Policy 144 which requires voter approval after the County endorses any new quarries outside the urban zone. (*Id*. at p. 278.) The *Sunol* court rejected the notion that Policy 144 read in conjunction with Section 22 required voter approval of every quarry outside the urban zone that had not received "all approvals and permits." Instead, the court held that, "[a]ssuming Measure D applies generally to development that has not received all

16

The County also argues that even if a project has received all discretionary approvals prior to Measure D's effective date, it would still be prohibited under Section 3 of Measure D.  As described in our factual summary, Section 3 is a savings clause that states no part of the measure should be applied in a way that would deprive "any person of constitutional or statutory rights or privileges" or in a way inconsistent with state or federal law.  The last sentence of Section 3 states:  "To the extent that a provision or provisions of this ordinance do not apply because of this section, then only the minimum development required by law which is most consistent with the provisions and purposes of this ordinance shall be permitted."

The County focuses exclusively on this last sentence to argue that Section 3 imposes a "strict requirement" that any right to develop a project after the effective date must be confined to the "minimum development required by law which is most consistent with" Measure D.  From this premise, the County builds this argument:  (1) obtaining all discretionary County approvals and permits does not confer a "vested" right to complete a project; (2) without a vested right, a development project that is inconsistent with Measure D cannot be legally completed; (3) therefore, it "makes no sense" to interpret Section 22, subdivision (b) as authorizing a developer to continue with a project that he or she has no vested right to complete.

The County's syllogism fails for a couple of reasons.  Obtaining all discretionary permits and approvals prior to the measure's effective date does confer a vested right to complete a project pursuant to the language of Measure D.  The County again focuses on a part of Measure D in isolation so it can manufacture a conflict with another part of the measure.  Section 3 unequivocally states that Measure D was not intended to alter any person's substantive legal rights.  It is absolutely consistent with Section 22, which limits Measure D's application by preserving development, whether existing or proposed, that was approved by the County as of its effective date.  The County's convoluted vested

discretionary approvals and permits prior to the effective date of the initiative, Policy 144 limits its provision to a subset of those developments-to quarries not approved by the County."  (*Id*. at p. 284.)

17

rights theory does not undermine the clear language and obvious intent of these provisions.

Section 22 is not ambiguous. By its plain language, it creates an exemption from the restrictions and requirements of Measure D for all existing and unaltered development, or proposed development provided the developer obtained all discretionary County approvals and permits before December 22, 2000. Indeed, there was no dispute about the meaning of this provision when the parties executed a stipulation of undisputed facts in the trial court which included the following statement: "Section 22 of Measure D states that Measure D applies only to development or proposed development which has not received all discretionary county approvals and permits prior to the effective date of the ordinance." Although the County now wishes to back away from a straightforward and logical interpretation of Measure D to suit its interests in this appeal, nothing convinces us there is any merit in its alternative arguments made for the first time in this court.

### c. *The County's New Factual Theory*

The County's last line of defense rooted in Section 22 is that, even if Section 22 exempts development and proposed development that obtained all discretionary approvals before Measure D became effective, the project did not qualify for the exemption because Lockaway failed to timely obtain all discretionary approvals.

Although mixed in with the County's legal theories bearing on interpretation of Section 22, this actually challenges the sufficiency of the evidence supporting the trial court's findings of fact. The September 2009 order, which was incorporated into the statement of decision, contains an express finding that when Lockaway purchased the property, the County had "already granted the final *discretionary* permit necessary to the project Plaintiffs had in mind. Subsequent permits—for grading or building, for instance, were and are indisputably ministerial in nature."

Two principles of appellate review preclude the County from challenging this finding on appeal. " 'Under the doctrine of invited error, where a party, by his conduct, induces the commission of an error, he is estopped from asserting it as grounds for

18

reversal.  [Citations].  Similarly an appellant may waive his right to attack error by expressly or impliedly agreeing at trial to the ruling or procedure objected to on appeal.' " (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685-1686; see also *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 950.)

Prior to the trial court hearing on the summary adjudication motions, the County executed a written stipulation which established that the CUP for the Lockaway project was obtained before Measure D went into effect and that the grading permit, although issued after the measure went into effect, was a ministerial permit.  Then, at the hearing, the superior court asked County counsel whether all building permits for the Lockaway project were ministerial.  County counsel conceded the point and stated that Lockaway obtained all discretionary permits required for its project before Measure D went into effect.  When the court granted Lockaway summary adjudication, it stated "[a]t oral argument counsel for the County further conceded that in this case the building permit is ministerial—in short, that Lockaway *had* received all discretionary permits prior to the effective date of Measure D."

The stipulation and counsel's acquiescence at the hearing operate to bar the County from now challenging the superior court's finding that Lockaway secured all discretionary County approvals before Measure D went into effect.  "[F]airness is at the heart of a waiver claim. . . .  In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack.  [Citation.] Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.)

Thus, we conclude that the County has failed to establish that the trial court erred when it found that the Lockaway project was exempt from the use restrictions imposed by Measure D.

**B.**     *The Regulatory Taking*

Even if Measure D did not prohibit Lockaway from completing its project, the County says that its temporary suspension of the project did not amount to a constitutional taking as a matter of law. The County bases its position on two alternative theories. It argues that the trial court's determination of whether or not there was a taking should have been decided by application of the rule announced by the California Supreme Court in *Landgate Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006 (*Landgate*), rather than the factors to be considered under the test announced by the Supreme Court of the United States in *Penn Central, supra,* 438 U.S. 104. The County also argues that even the application of the factors identified in *Penn Central* should lead to a conclusion that no taking occurred in this case. We will first discuss the general legal principles that govern a takings claim, and in this context discuss the application of the *Penn Central* factors to the facts of this case. We will then explain why the trial court's analysis was properly controlled by *Penn Central* rather than *Landgate*.

"Whether the County's actions constituted a taking is a mixed question of law and fact. [Citations.] Our review is neither entirely de novo nor entirely limited by the substantial evidence rule. [Citation.] 'Mixed questions of law and fact involve three steps: (1) the determination of the historical facts—what happened; (2) selection of the applicable legal principles; and (3) application of those legal principles to the facts. The first step involves factual questions exclusively for the trial court to determine; these are subject to substantial evidence review; the appellate court must view the evidence in the light most favorable to the judgment and the findings, express or implied, of the trial court. [Citations.]' [Citation.] Thus, we do not apply de novo review to factual findings underlying the trial court's judgment, instead applying the substantial evidence rule. [Citation.] Only the second and third steps involve questions of law, which we review de novo." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269-270 (*Shaw*).)

The Fifth Amendment prohibits government from taking private property for public use without just compensation. (U.S. Const., 5th Amend.) The federal takings

clause applies to the states via the Fourteenth Amendment.  (*Chicago, Burlington & Q. R'D v. Chicago* (1897) 166 U.S. 226, 234.)  Moreover, the takings clause in the California Constitution is "construed congruently with the federal clause."  (*Shaw, supra,* 170 Cal.App.4th at p. 260.)

The Fifth Amendment " 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'  [Citation.]  In other words, it 'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.' "  (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536-537 (*Lingle*).)  In this way, the takings clause precludes the " 'Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "  (*Ibid*.)

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property."  (*Lingle, supra*, 544 U.S. at p. 537.)  However, courts have long recognized that "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment."  (*Ibid*.; see also *Kavanau v. Santa Monica Rent Control Bd*. (1997) 16 Cal.4th 761, 773 (*Kavanau*).)  More recently, the United States Supreme Court confirmed that a regulation may effect a taking requiring just compensation even if it does not deprive the owner of "all economically beneficial use" of his or her property, depending on the particular circumstances of the case.  (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617.)

Furthermore, a temporary regulatory taking may require payment of just compensation for the period the taking was in effect.  (*First Lutheran Church v. Los Angeles County* (1987) 482 U.S. 304, 321 [applying rule to taking of all use of property].)  Thus, if a property owner prevails in an inverse condemnation action, and the regulatory agency elects to withdraw the regulation that effected the taking, the property owner may have a right to just compensation for the period that the regulation was in effect.

21

(*Kavanau, supra,* 16 Cal.4th at p. 773; see also *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246, 251.)

A regulatory takings analysis rests on the foundational principle that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." (*Penna. Coal Co. v. Mahon* (1922) 260 U.S. 393, 415.) To assist courts in discerning "how far is 'too far,' " the United States Supreme Court has identified three distinct categories of regulatory takings and the tests for evaluating each. (*Lingle, supra*, 544 U.S. at p. 538.) First, there is government action which requires a property owner to "suffer a permanent physical invasion" of his or her property. (*Ibid.*) The second category includes regulatory conduct that does not result in any physical invasion but deprives the owner of "all economically beneficial use" of the property. (*Ibid.*) These two "relatively narrow categories" of regulatory action are subject to a categorical rule and are deemed per se takings for Fifth Amendment purposes. (*Ibid.*) A regulatory taking challenge that does not fall into one of these two narrow categories is evaluated under a set of standards first articulated by the Supreme Court in *Penn Central, supra,* 438 U.S. 104. (*Lingle, supra*, 544 U.S. at p. 538.)

The *Penn Central* inquiry is not a formula but an ad hoc factual inquiry that weighs "several factors for evaluating a regulatory taking claim." (*Penn Central, supra*, 438 U.S. at p. 124; *Lingle, supra*, 544 U.S. at p. 538.) Courts conducting such an inquiry have identified three primary factors: (1) the "economic impact" of the regulation on the claimant, (2) the extent to which the regulation interfered with "distinct investment-backed expectations," and (3) the "character of the governmental action." (*Shaw, supra*, 170 Cal.App.4th at p. 272; see *Penn Central, supra*, 438 U.S. at p. 124.) These *Penn Central* factors are "the principal guidelines" for resolving regulatory takings claims that do not fall within the two per se categories. (*Lingle, supra*, 544 U.S. at p. 539.)

The *Penn Central* inquiry is not a means-ends test; the question is not "whether a regulation of private property is *effective* in achieving some legitimate public purpose." (*Lingle, supra,* 544 U.S. at p. 542.) Instead, the goal is to assess the "*magnitude or character of the burden* a particular regulation imposes upon private property rights" in

order to determine whether its effects are "functionally comparable to government appropriation or invasion of private property." (*Ibid.*)

We will first consider the economic impact of the regulation on Lockaway. Of course, many land use regulations that adversely impact property interests are not regulatory takings. (*Shaw, supra*, 170 Cal.App.4th at p. 272; *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1278.) But a government action that *unreasonably* impairs the value or use of the property may be an indication that a taking occurred. (*Ibid.*)

The County's decision to deny Lockaway the right to complete its development project did not render the property worthless. The trial court found that some alternative uses, consistent with the terms of Measure D, had calculable commercial value. However, the court also found that Lockaway always intended to develop the property as a storage facility, and requiring it to pursue some different authorized use would have deprived Lockaway of the return on its investment that it "reasonably expected from the intended use." Furthermore, the court found that by August 2002 when the County "got around to informing [Lockaway] that Measure D would have stopped their project in its tracks back in December 2000," Lockaway was fully committed to developing the storage facility and had already spent significant resources committing its property to that specific use. The court also found that Lockaway would have incurred substantial costs to convert the property to another use after the County had shut it down and would have suffered a material decrease in its value. On appeal, the County does not dispute any of these findings, and they all support the trial court's conclusion that the County's regulatory action unreasonably impaired both the value and use of the Lockaway property.

The second *Penn Central* factor requires us to consider the extent to which the County's regulatory action interfered with Lockaway's distinct investment backed expectations. "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.' " (*Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1005.)

23

The evidence supports the conclusion that this factor is satisfied. Lockaway purchased the property only after the County expressly confirmed that Lockaway could rely on the 1999 CUP to develop a storage facility. After its initial confirmation, the County worked closely with Lockaway for a few years. As the termination date of the 1999 CUP approached, County staff told Lockaway that the CUP had been implemented. But once the September 22, 2002, expiration date had passed, the County changed its position and used Measure D to shut the Lockaway project down. On these facts, there is no denying that Lockaway had a reasonable investment backed expectation its project could proceed from the time it purchased the property in 2000, until the County changed its position in 2002.

The third *Penn Central* factor requires us to consider the "character" of the County's action. (*Penn Central, supra*, 438 U.S. at p. 124; *Lingle, supra*, 544 U.S. at p. 542.) To illustrate what this means, the *Lingle* court stated that whether a governmental action "amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred." (*Lingle, supra*, 544 U.S. at p. 539.)

Here, the County caused no physical invasion of the Lockaway property. By the same token, however, the County's decision to abandon the approvals for the Lockaway project cannot be justified as a "mere" consequence of a public program. Instead, the character of the County's decision is defined by the circumstances surrounding the application of the Measure D restrictions to this project. The trial court found that the County made a "showstopping U-turn starting with the September 23, 2002 [Advisory Council] meeting at which it took the eleventh-hour position that nothing Plaintiffs did—or could have done—since way back in December of 2000 when Measure D became effective, would have made any difference in the outcome of the permit process. When this trap door closed on Plaintiffs, the 'character' of the government's conduct revealed itself."

24

On appeal, the County contends there is insufficient evidence to support the trial court's findings regarding the character of its regulatory action. We disagree. The following pertinent facts are supported by substantial evidence. The County did not take any action to shut down the Lockaway project in December 2000 when Measure D went into effect. Instead, it encouraged Lockaway to continue its development efforts for 18 months. Then, in September 2002 the County changed its position and announced that the project had been doomed since December 2000 because Lockaway had not obtained all permits and commenced construction before Measure D's effective date. In taking this new stand, the County refused to even consider whether Section 22 exempted the Lockaway project.

These facts support the trial court's conclusion that the County's regulatory about face was manifestly unreasonable, not just because of its devastating economic impact on Lockaway, but also because it deprived Lockaway of a meaningful opportunity to attempt to protect its property rights. If the County had invoked Measure D in December 2000, Lockaway could have then chosen to abandon its project or to challenge the County's regulatory action as a taking. Alternatively, if, in September 2002 the County had taken the position that Lockaway failed to implement the 1999 CUP, Lockaway could have secured an administrative determination as to whether it had a vested right to complete the project. Instead, the County solicited the application for a new CUP in September 2002, and then took the position that any of Lockaway's efforts after December 2000 were irrelevant. In fact, the County does not dispute the trial court's express finding that the County "utterly failed to analyze, account for, or even mention, the safe harbor language in Section 22 of the measure" during the regulatory process leading up to this litigation.

Now, the County spends significant effort attempting to convince us to adopt a new and different interpretation of Section 22 which arguably in hindsight could support the County's decision to block the Lockaway project. The County also argues that each of its possible interpretations of Section 22 that we have rejected in part III.A.2, *ante*, of this opinion show that the County's regulatory position was reasonable. Nonsense. First

25

of all, as we have discussed, each of these interpretations is based on a strained reading of Measure D. Moreover, there is nothing in this record to suggest anyone at the County thought of these reasons when the County determined that the Lockaway project was prohibited by Measure D. The County steadfastly refuses to address the consequences that would normally flow from the fact that it never made any of these legal arguments until after Lockaway obtained the writ of mandate. By acting as it did, the County effectively precluded Lockaway from obtaining administrative review of the many issues that the County has aggressively pursued in judicial proceedings.[3]

Thus, although the County protests the factual underpinnings for the trial court's characterization of its action as unfair, our analysis of the third *Penn Central* factor shows the court's findings are supported by substantial evidence. Accordingly, the County has failed to establish that the trial court committed reversible error when it determined that under the *Penn Central* inquiry, the County's application of Measure D to shut down the Lockaway project was a temporary regulatory taking that required the payment of just compensation.

## C. *Landgate*

In *Landgate, supra,* 17 Cal.4th 1006, the California Coastal Commission denied a property owner's application for a development permit on various grounds including one that had previously been approved by the county. The trial court concluded the Commission did not have jurisdiction to reverse the county's determination, issued a writ of mandate requiring the Commission to reconsider the property owner's application, and found that the two-year delay in the permitting process due to the Commission's

---

[3] In the trial court, the County argued that Lockaway was free to raise any issue in the various administrative proceedings. As the trial court found, this argument misses the point. During the administrative proceedings, the County never took the position that Lockaway did not have a vested right in the project because it did not implement the 1999 CUP, and yet that was a central argument at trial. Similarly, during the administrative hearings, the County never advanced any of the legal interpretations of Section 22 that comprise a significant portion of this appeal.

26

disapproval constituted a temporary regulatory taking.  (*Id*. at pp. 1010-1014.)  The Court of Appeal affirmed the judgment but our Supreme Court reversed.

The Supreme Court framed the issue as "whether a legally erroneous decision of a government agency during the development approval process resulting in delay constitutes a temporary taking of property."  *(Landgate, supra*, 17 Cal.4th at p. 1018.)  The court concluded that such an error alone does not amount to a taking when it is "part of a reasonable regulatory process designed to advance legitimate government interests." (*Id*. at p. 1021.)  Furthermore, the court found, "[t]he proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter."  (*Id*. at p. 1022.)  But the *Landgate* rule is subject to an important caveat, "a government agency may not evade the takings clause by fabricating a dispute . . . or by otherwise arbitrarily imposing conditions on development in order to delay or discourage that development. The government agency's assertion of authority, whether or not erroneous, must advance some legitimate government purpose."  (*Id*. at p. 1029.)  Thus, for example, even when a regulation substantially advances a legitimate government purpose, if the agency's "position was so unreasonable from a legal standpoint as to lead to the conclusion that it was taken for no purpose other than to delay the development project before it," the action would amount to a taking.  (*Id*. at p. 1024.)

In the present case, the County contends the trial court committed reversible error when it made its taking determination by applying *Penn Central* instead of *Landgate*. Moreover, it says that under *Landgate*, its change of position did not constitute a temporary regulatory taking as a matter of law.  We disagree with both of these contentions.

*Landgate* was decided before the United States Supreme Court announced its decision in *Lingle, supra*, 544 U.S. 528, that held regulatory takings cases that do not fall into one of two narrow categories are governed by the *Penn Central* test.  In *Landgate,* the court acknowledged the *Penn Central* factors, but it relied on a different test evolved

27

from language in *Agins v. City of Tiburon* (1980) 447 U.S. 255, 260. (See *Landgate, supra*, 17 Cal.4th at pp. 1016, 1019, 1021, 1022.) The *Agins* court stated that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, [citation], or denies an owner economically viable use of his land." (*Agins, supra,* 447 U.S. at p. 260.) Through development of the case law, the *Agins* rule evolved into a "stand-alone regulatory takings test" which focused exclusively on whether the challenged government action substantially advanced a legitimate state interest. (See *Lingle, supra*, 544 U.S. at p. 542.)

However, the *Lingle* court expressly held that "the 'substantially advances' formula announced in *Agins* is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation." (*Lingle, supra,* 544 U.S. at p. 545.) As the *Lingle* court explained, the formula is a due process test which, when used as a takings test, is "*doctrinally* untenable" and poses "serious practical difficulties." (*Id.* at p. 544.) That formula is not a useful tool for identifying a taking because it "reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights" and it does not provide any information about "how any regulatory burden is *distributed* among property owners." (*Id.* at p. 542.) As a practical matter, the formula would require courts to engage in a "means-ends" analysis of government regulations affecting private property which is "a task for which courts are not well suited." (*Id.* at p. 544.)

In light of *Lingle*, we reject the County's contention that *Landgate* establishes an independent test for evaluating whether government action is a regulatory taking. The only case the County cites to support its contention was decided before *Lingle*. (See *Loewenstein v. City of Lafayette* (2002) 103 Cal.App.4th 718, 731, 733 [erroneous denial of application for lot line adjustment not a temporary taking absent evidence that action "was taken for any motive other than carrying out a substantial government interest"].) Indeed, since *Lingle* was decided, several courts have questioned whether the *Landgate* rule remains viable. (See *Shaw, supra*, 170 Cal.App.4th at p. 264 [and authority cited there]; see also *Los Altos El Granada Investors v. City of Capitola* (2006) 139

28

Cal.App.4th 629, 651.) We have no doubt that the trial court applied the proper analysis in this case by following *Penn Central*. (*Lingle, supra*, 544 U.S. 528.)

Moreover, even assuming *Landgate* remains good law, its complete holding is that a delay in the development process caused by an agency's mistaken though plausible assertion of jurisdiction is a "normal delay" that, by itself, does not constitute a temporary taking, but such a taking may result from patently unreasonable or arbitrary governmental action. (See *Landgate, supra*, 17 Cal.4th at pp. 1010, 1020-1021, 1024, 1029; see also *Ali, supra,* 77 Cal.App.4th at p. 254 [temporary taking occurred when delay in the regulatory process attributable to an agency position was "so unreasonable from a legal standpoint as to be arbitrary."].)

In this case, the trial court considered the *Landgate* rule in the context of its application of the third *Penn Central* factor, which focuses on the character of the governmental conduct. In that context, the court rejected the County's theory that its "conduct amounted to no more than normal delay in the permit process," and instead found that the circumstances surrounding the "doctrinal shift" in the County's interpretation of Measure D "takes the case out of the 'normal-if-mistaken-regulatory-activity' paradigm and turns it into a taking."

The County continues to claim that its conduct was nothing more than an honest mistake resulting in a normal regulatory delay. Under the County's version of events, some of its staff honestly but erroneously believed that Measure D did not prevent Lockaway from completing its project until they consulted County counsel in August 2002, when counsel corrected the staff's legally erroneous interpretation of the measure. Thereafter, the County says, it reasonably relied on the advice of legal counsel when it adopted its new and allegedly correct interpretation of Measure D which precluded Lockaway from completing its project.

The most obvious problem with this argument is the County's position that its 2002 interpretation of Measure D was legally correct. It was not. Nor do the record citations provided by the County show anything more than the fact County counsel adopted a different interpretation of Measure D than the interpretation employed by

29

County staff during the two years Lockaway owned the property before the regulatory hearings began.  This evidence does not establish the basis for the County's about face, or support the conclusion that the County made an honest and reasonable mistake that led to normal delay.

Equally troubling, the County ignores the evidence that supports the trial court's finding that the timing and nature of the County's change of position take this case outside of the *Landgate* rule.  The timing of the County's shift had a substantial negative economic impact on Lockaway and eviscerated its reasonable investment backed expectations.  Its dogmatic interpretation of Measure D adopted in August 2002 deprived Lockaway of a meaningful opportunity to protect its property rights.  *Landgate, supra*, 17 Cal.4th 1006, does not alter our conclusion that substantial evidence supports the trial court's finding that a compensable temporary regulatory taking occurred.  In fact, it reinforces it.

**D.     *Attorney Fees***

The County contends that even if the judgment is affirmed, the award of attorney fees to Lockaway must be reversed because the fee award included compensation for work attributable to civil rights causes of action on which Lockaway did not prevail.

**1.     *Background***

Section 1036, states that:  "In any inverse condemnation proceeding, the court rendering judgment for the plaintiff by awarding compensation . . . shall determine and award or allow to the plaintiff, as a part of that judgment . . . a sum that will, in the opinion of the court, reimburse the plaintiff's reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of that proceeding in the trial court or in any appellate proceeding in which the plaintiff prevails on any issue in that proceeding."

Lockaway moved for a lodestar award of $703,760 for attorney fees actually incurred, plus a 1.25 multiplier for a total award of $879,700.  Lockaway supported its fee request with attorney time records, a declaration of counsel and the declaration of an attorney who specializes in land use law.  The lodestar request included fees for work on

the unsuccessful civil rights claims because Lockaway considered those claims to be related to their successful inverse condemnation claim since all "were based on the same identical underlying facts and the damages were identical." According to Lockaway, the civil rights claims were essentially alternative legal theories and work done on those claims was therefore recoverable under section 1036.

The County opposed the attorney fee motion on several grounds, including that section 1036 limited recoverable fees to efforts related only to the inverse condemnation cause of action, and that the lodestar request was inflated because it included fees for work done on the civil rights claims and work related to liability of individual defendants who could not have been liable for inverse condemnation. At the conclusion of the hearing, the court took the matter under submission.

The trial court awarded Lockaway its fees on June 10, 2011. That order states in pertinent part: "After considering all of the briefs, declarations and evidence submitted to the Court, as well as the record in this matter, and having heard the arguments of counsel, the Court awards attorney fees to plaintiff in the amount of $703,760.00 with an additional $24,255.50 for work preparing for and attending this hearing for a total of $728,015.50, an amount the Court finds to be reasonable under all of the circumstances."

### 2. *Analysis*

Although the County claims that the trial court failed to "specify the basis for the award," it is obvious from the record that the court adopted the lodestar approach proposed by Lockaway, rejected the multiplier and awarded Lockaway fees for work on both the inverse condemnation claim and the relevant civil rights causes of action pursuant to section 1036.

The County does not dispute that section 1036 authorizes a fee award in this case. Rather it contends that the trial court's decision to award fees for work conducted in connection with the unsuccessful civil rights claims cannot be sustained, at least not on this record. Therefore, the County requests that we reverse the fee order and remand this case for further proceedings. As we shall explain, a remand is not necessary.

31

The trial court had discretion to award Lockaway fees incurred with respect to the civil rights causes of action if they were relevant to the inverse condemnation claim. When awarding fees under section 1036, "the trial court generally should apportion between attorney fees incurred in litigating the inverse condemnation claim and fees incurred with respect to other claims for which attorney fees are not recoverable, and award only the former. [Citations.] However, the trial court has discretion to award fees incurred with respect to a noninverse condemnation cause of action that is relevant to the inverse condemnation claim." (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 365-366.)

At the hearing on the fee motion, the trial court expressly stated that the degree of interconnection between the inverse condemnation claim and the civil rights causes of action was a key consideration. The trial court considered all the pleadings and evidence before making its ruling. We have no difficulty concluding that the trial court made an implicit finding that Lockaway was entitled to fees incurred on the civil rights claims because that work was relevant to its inverse condemnation cause of action.

The County contends that no such finding can be implied, but settled principles of procedure say otherwise. A trial court is not required "to issue a statement of decision with regard to the fee award," or to provide detailed reasons for overruling objections to a fee request. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140.) Furthermore, since the County did not request a statement of decision with specific findings, " ' "[a]ll intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown." ' " (*Ibid*.) "No specific findings reflecting the court's calculations [are] required. [Citation.] 'The record need only show that the attorney fees were awarded according to the "lodestar" or "touchstone" approach.' [Citation.] On appeal we infer all findings in favor of the prevailing parties." (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 254.)

According to the County, the trial court's discretion afforded by section 1036 is so "limited" that a trial court cannot award fees for work on non-inverse condemnation claims unless it makes an explicit finding that alleged sets of claims are relevant to one

another.  However, the case the County cites for this proposition, *Red Mountain, supra*, 143 Cal.App.4th at 367, does not hold or intimate that section 1036 requires that the trial court make such an explicit finding.

The County also relies on *Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86 (*Greater Westchester*),where a property owner secured a judgment against the City for direct condemnation, inverse condemnation and personal injury on a nuisance theory.  The trial court awarded plaintiffs' attorney fees but did not segregate or allocate the fees among the three bases for relief.  The *Greater Westchester* court held that the fees should have been segregated because (1) the plaintiffs could recover fees for direct condemnation "only when and if" the trial court made certain statutory findings that had not been made during the attorney fee proceeding in the lower court; (2) "[a]ttorney's fees [were] clearly recoverable and appropriate with respect to inverse condemnation" under section 1036; and (3) the parties in that case had already agreed that fees could not be assessed with respect to the personal injury claim.  (*Greater Westchester, supra,* 26 Cal.3d at pp. 103-104.)

According to the County, "*Greater Westchester* makes clear [that] fee-shifting is allowed under a particular statute 'only when and if the trial court makes those statutory findings required by' the statute."  However, the *Greater Westchester* Court's conclusion in this regard only addressed Code of Civil Procedure section 1250.410, which authorizes a fee award for direct condemnation.  (*Greater Westchester, supra*, 26 Cal.3d at p. 104.)  The court did not hold that section 1036 requires any express findings.

Finally, the County spends significant time arguing that the section 1036 "relevancy" requirement is an exacting test which requires something more than a determination that two sets of claims are "related."  We will not address this theory because the County does not challenge the sufficiency of the evidence to support the trial court's implied finding that the civil rights claims were relevant to the inverse condemnation cause of action, and the record in this court does not support the argument.  The County apparently made the strategic decision to exclude evidence pertinent to the

33

fee request from the appellate record, gambling that we would grant its request for a remand.

## IV.  DISPOSITION

The judgment and order awarding attorney fees are affirmed.


_____
Siggins, J.


We concur:


_____
McGuiness, P.J.


_____
Jenkins, J.

Trial Court:                                              Alameda County Superior Court

Trial Judge:                                             Honorable James A. Richman
                                                         Honorable John M. True, III

Counsel for Defendants and Appellants:                   Robert G. Crow
                                                         Jill Sazama
                                                         Boornazian, Jensen & Garthe

                                                         Brian E. Washington
                                                         Office of the County Counsel
                                                         County of Alameda

                                                         Rick W. Jarvis
                                                         Andrea J. Saltzman
                                                         Jarvis, Fay, Doporto & Gibson

Counsel for Plaintiffs and Respondents:                  Timothy V. Kassouni

Counsel for Amicus Curiae on behalf
   of Plaintiffs and Respondents:                        R. S. Radford
                                                         Pacific Legal Foundation