Filed 11/19/15

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| YOUNG'S MARKET COMPANY,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>    Respondent,<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>    Real Party in Interest. | D068213<br><br>(San Diego County<br> Super. Ct. No.<br> 37-2015-00007265-CU-PT-CLT) |


Petition for writ of mandate from an order of the Superior Court of San Diego

County, Lisa C. Schall, Judge. Petition denied.

Allen Matkins Leck Gamble Mallory & Natsis and Kenneth Erik Friess, Nicholas

S. Shantar for Petitioner.

Stark & D'Ambrosio and James A. D'Ambrosio, George A. Rios, III for K1 Speed,

Inc., as Amicus Curiae on behalf of Petitioner.

Dannis Woliver Kelley and Janet L. Mueller, Cameron C. Ward, Kirsten Y. Zittlau on behalf of Real Party in Interest.

Young's Market Company (Young's) petitions for a writ of mandate and/or prohibition asking the superior court to vacate its order granting the petition of real party in interest San Diego Unified School District (District) for a right of entry pursuant to the Eminent Domain Law (Code Civ. Proc.,[1] § 1245.010 et seq., at times the entry statutes). By its petition, District sought to conduct certain investigations and environmental testing on Young's property, which the superior court permitted under specified conditions. Young's contends District's proposed activities go beyond the entry statutes, which to comply with the state and federal Constitutions permit only innocuous and superficial inspections before condemnation. According to Young's, District's actions constitute a taking—a permanent physical occupation of its property—requiring District to file a condemnation suit to litigate the need for the taking and provide Young's with a jury determination of just compensation.

We disagree. District's proposed actions, which are temporary and limited intrusions on the property, neither violate the entry statutes nor do they constitute a taking requiring a jury determination of just compensation. Accordingly, we deny the writ petition.

---

[1] Statutory references are to the Code of Civil Procedure. Young's asserts it has been erroneously identified as Young's Market Company and that the correct entity is Young's Holdings, Inc. We will simply refer to it throughout as Young's.

2

FACTUAL AND PROCEDURAL BACKGROUND

Young's owns approximately two acres of real property in downtown San Diego adjacent to an elementary school owned and operated by District. The property contains an over 50,000 square foot industrial building, parking lot and landscaping. Young's leases the property to K-1 Speed, Inc. (K-1), which operates an indoor kart racing center with arcade lounges, eating areas and retail merchandising. K-1 operates seven days a week.

In March 2015, District petitioned for an order granting it a right of entry under sections 1245.010 and 1245.030, asserting it was interested in potentially acquiring the property to expand the elementary school and construct other school facilities. District alleged it was authorized to acquire property by eminent domain for those purposes, and required access to conduct mandated preliminary studies and assessments. District had sought Young's consent, but Young's declined to provide access, telling District it was not interested in selling the property. District attached a survey prepared by an environmental assessment consultant detailing the scope of the proposed work, which included drilling boring holes to conduct groundwater and soil samples, then backfilling with sand or bentonite grout and resurfacing with concrete, as well as bulk sampling of building materials suspected to contain lead or asbestos.[2] District stated it expected the

_____

2       District's proposed work was detailed in a "Limited Phase II Environmental Site Assessment and Hazardous Building Materials Survey" as: site reconnaissance and marking of boring locations with white paint; a geophysical survey to evaluate the proposed boring locations for potential subsurface utility conflicts; coring 10 locations of concrete using a two-inch diameter drill bit in concrete up to six inches thick; boring 33

3

work would take eight to 10 business days to complete. It believed any compensation for the activities would be nominal and stated it was prepared to deposit the probable amount as determined by the court. District's proposed order stated in part that District "shall not access the [property] on more than ten (10) business days within a sixty (60) day period without the prior consent of this Court" and it would "deposit with this Court the total probable amount of just compensation of One Thousand Dollars ($1,000) or _____ ($_____)."

Young's opposed the petition. Characterizing District's actions as a sweeping and comprehensive drilling and sampling project, it argued the entry statutes only authorized innocuous or superficial entries on property, akin to preparing a survey or map, and not such an unrestricted property-wide occupation assertedly lasting from two weeks to 60 days or more. It asserted District's proposal went far beyond the entry statutes, and was an unconstitutional taking under the United States and California Constitutions as reflected in *Jacobsen v. Superior Court of Sonoma County* (1923) 192 Cal. 319

---

holes within a 50-foot square grid partially outside of the building's footprint, 30 holes at three feet deep and three at 20 feet deep; collecting soil samples from the borings; collecting groundwater samples from the 20-foot borings; boring three 15-foot holes adjacent to the 20-foot holes per Department of Toxic Substances Control requirements; collecting two soil vapor samples; abandoning the borings by backfilling the three-foot holes with clean sand to near the ground surface and resurfacing with concrete; backfilling the 20-foot holes with bentonite grout to near the ground surface and resurfacing with concrete; surveying and inspecting the building to identify homogeneous areas, suspect materials and suspect surfaces; non-destructive X-ray fluorescence testing to test surfaces suspected to contain lead; bulk sampling by a Division of Occupational Safety and Health Certified Asbestos Consultant or Site Surveillance Technician of postage-stamp-sized pieces of building materials suspected to contain asbestos; and visual identification and quantification of building materials falling under the Universal Waste Rule.

4

(*Jacobsen*). Young's argued District's proposal to remove dirt and building materials effected an obvious permanent physical occupation or per se taking for which it was required to file a condemnation suit and pay just compensation as determined by a jury. Young's alternatively asked the court to stay the action to await the California Supreme Court's decision in a case concerning the constitutionality of the entry statutes,[3] or, if it were inclined to grant the petition and allow District to proceed, order District to deposit a minimum of $500,000 toward compensation in lost rent, goodwill and property.

In reply, District argued Young's grossly mischaracterized the duration, nature and extent of the proposed work, which was not as extensive as that in *Jacobsen*, *supra*, 192 Cal. 319.[4] It presented the declaration of Lisa Bestard, an environmental testing scientist with the consultant hired by District. Bestard explained that the purpose of the

---

[3] In *Property Reserve v. Superior Court* (2014) 224 Cal.App.4th 828, review granted June 25, 2014, No. S217738, involving the State of California's petition to enter properties for environmental and geological studies so as to determine their suitability for a proposed water tunnel, the California Supreme Court will address the following questions: "(1) Do the geological testing activities proposed by the Department of Water Resources constitute a taking? (2) Do the environmental testing activities set forth in the February 22, 2011, entry order constitute a taking? (3) If so, do the precondemnation entry statutes (Code Civ. Proc., §§ 1245.010-1245.060) provide a constitutionally valid eminent domain proceeding for the taking?"

[4] In part, District pointed out that in *Jacobsen* the proposed work included creating four-by six-foot test pits, installing a boring rig and boring to depths of 150 feet or more, and excavating the land. (*Jacobsen*, *supra*, 192 Cal. at p. 322.) It stated that for its proposed work, no borings would occur inside the building facility, the borings would be 2 to 4 inches in diameter and closed off or covered when sampling was complete, and the vast majority would be refilled with sand, not concrete, then resurfaced with concrete to match the original composition. District revised its proposed order to permit it to obtain access to the property for a maximum of 10 consecutive business days excluding weekends.

5

investigative activities was to obtain initial data to evaluate if impacted soil, groundwater and/or soil vapors were present at the property and if so, evaluate if contamination levels precluded it from being used as a future school site. She stated her company's proposal sought a maximum of eight to 10 business days, excluding weekends, to conduct the work, which could be done on consecutive days. Bestard described the drilling rig as a direct-push drill mounted in the bed of a utility truck that would fit within a regular-sized parking space; she explained this type of drill disrupts very little soil around the actual drill space, and approximately three people are involved in the drilling activities. Further, Bestard explained the monitoring wells referenced in the project were temporary, as they would stay open for 24 hours at the most. As for the building material sampling, Bestard stated that under her company's proposal, "a small sample (less than the size of a postage stamp) will be removed from an area that is not visible. For example, we would take a small piece of the building material from underneath an electrical outlet (which we would first remove) or remove a small piece of material from behind a piece of equipment (namely, a refrigerator or snack machine)."

District argued its work did not constitute a taking, pointing out that borings and samplings were expressly authorized by section 1245.010 of the entry statutes, and it was statutorily mandated to perform such work before a proposed site could be approved as a school site. Finally, District argued the $500,000 in compensation proposed by Young's was speculative and exaggerated; there was no evidence K-1 would suffer any business interruption or lost profits, or that Young's would lose rental income, and in the event of unforeseen damage the court could modify its order for a deposit.

6

The superior court granted the petition, ordering District could enter the property to conduct the investigations identified in its petition on condition that it deposit with the court $5,000 as a probable amount of compensation and serve K-1 with a copy of the order. Under the order, K-1 was given 45 days after service to either reach an agreement with District or apply ex parte to enjoin District's investigations. If K-1 did not do so or its ex parte application was denied, the court ordered District would then have the "immediate right" to conduct its investigations.

Young's filed a verified petition for writ of mandate, prohibition or other appropriate relief, largely repeating its arguments below.[5] It sought an immediate stay and a peremptory writ in the first instance directing the superior court to vacate its order, or issue an alternative writ directing the court to grant that relief or show cause why it should not be ordered to do so, and on return of that writ issue a peremptory writ of mandate directing the court to vacate its order.

We issued an order to show cause, deemed absent objection District's informal response a return to the petition, and stayed the trial court's order.

---

[5] Young's had also argued below that the court should deny District's petition because District did not join K-1, which was assertedly a necessary and indispensable party that should have been given the opportunity to participate in the proceeding. But Young's does not renew this argument or pray for any specifically related relief in its writ petition before us.

7

DISCUSSION

## I. *Standard of Review*

The parties dispute the applicable standard of review. In its return, District argues the appropriate review standard is abuse of discretion; it suggests we must decide whether the court applied the wrong legal standard and assess whether substantial evidence supports its findings where the underlying facts are in conflict. Young's maintains in reply that the facts are undisputed and the court's conclusion is "inherently legal," requiring that we review its order using an independent, de novo standard of review.

We apply a mixed review standard. The parties disputed the scope and extent of District's proposed activities below, so we review the trial court's express or implied factual findings on those matters for substantial evidence. (See *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31; *Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 183 (*Lockaway Storage*).) Under the substantial evidence standard, we "view the evidence in the light most favorable to the [order] and the findings, express or implied, of the trial court." (*Lockaway Storage*, at p. 183.) We resolve all conflicts in favor of District, and indulge all legitimate and reasonable inferences to uphold the findings if possible. (*In re Marriage of Bonds*, at p. 31.)

Having determined the historical facts, we then select the applicable legal principles and apply those legal principles to the facts in deciding whether District's actions constitute a compensable taking. (*Lockaway Storage*, *supra*, 216 Cal.App.4th at

p. 183; see also *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269-270.)

Those inquiries involve questions of law that we review de novo. (*Ibid.*; see *Shaw*, at

p. 270; *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1269.)

For Young's claim that District's actions violate the entry statutes under *Jacobsen*,

*supra*, 192 Cal. 319, we likewise apply an independent standard of review. (*Bay Cities*

*Paving & Grading, Inc. v. City of San Leandro* (2014) 223 Cal.App.4th 1181, 1187;

*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [appellate court reviews the

application of decisional law de novo].)

II. *Takings Jurisprudence and the Entry Statutes*

A. *Takings Law*

The state and federal Constitutions guarantee real property owners "just

compensation" when their land is taken for a public use. (*Jefferson Street Ventures, LLC*

*v. City of Indio* (2015) 236 Cal.App.4th 1175, 1192; see *Mt. San Jacinto Community*

*College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 653 [addressing the California

Constitution].) The California Constitution provides: "Private property may be taken or

damaged for a public use and only when just compensation, ascertained by a jury unless

waived, has first been paid to, or into court for, the owner. The Legislature may provide

for possession by the condemnor following commencement of eminent domain

proceedings upon deposit in court and prompt release to the owner of money determined

by the court to be the probable amount of just compensation." (Cal. Const., art. I, § 19.)

The federal Constitution provides that private property shall not "be taken for public use

without just compensation." (U.S. Const., 5th Amend.) By including damage to property

9

as well as its taking, California " 'protects a somewhat broader range of property values' than does the corresponding federal provision."  (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664; *Herzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 13.)  However, "the takings clause in the California Constitution is 'construed congruently with the federal clause.' "  (*Lockaway Storage*, *supra*, 216 Cal.App.4th at p. 183; see also *San Remo Hotel*, at p. 664.)

" 'The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property' — a categorical taking."  (*Shaw v. County of Santa Cruz*, *supra*, 170 Cal.App.4th at p. 260; see *Horne v. Department of Agriculture* (2015) ___ U.S. ___ [135 S.Ct. 2419, 2425-2426]; *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 537.)  Thus, a permanent physical occupation of property by the government is a taking.  (*Arkansas Game and Fish Com'n v. U.S.* (2012) ___ U.S. ___ [133 S.Ct. 511, 518] (*Arkansas Game*).)  A taking will also result where a government regulation "permanently requires a property owner to sacrifice all economically beneficial uses of his or her land."  (*Ibid.*; see also *Shaw*, at pp. 260-261.)

"Regulatory takings challenges outside these two categories, i.e., those that do not involve a physical invasion or that leave the property owner with some economically beneficial use of the property, are governed by the 'essentially ad hoc, factual inquiries' set forth in *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 124 [*Penn Central*]."  (*Shaw v. County of Santa Cruz*, *supra*, 170 Cal.App.4th at pp. 260-261; see also *Allegretti & Co. v. County of Imperial*, *supra*, 138 Cal.App.4th at p. 1270.)  "The *Penn Central* inquiry is not a formula but an ad hoc factual inquiry that weighs several

10

factors for evaluating a regulatory taking claim.  [Citations.]  Courts conducting such an inquiry have identified three primary factors: (1) the 'economic impact' of the regulation on the claimant, (2) the extent to which the regulation interfered with 'distinct investment-backed expectations,' and (3) the 'character of the governmental action.' [Citations.]  These *Penn Central* factors are 'the principal guidelines' for resolving regulatory takings claims that do not fall within the two per se categories." (*Lockaway Storage*, *supra*, 216 Cal.App.4th at p. 184.)  "[T]he goal is to assess the '*magnitude or character of the burden* a particular regulation imposes upon private property rights' in order to determine whether its effects are 'functionally comparable to government appropriation or invasion of private property.' "  (*Id*. at p. 185.)

The *Penn Central* inquiry applies equally to temporary physical invasions by the government; whether a compensable taking has occurred must be assessed by the same "case-specific factual inquiry."  (See *Arkansas Game*, *supra*, 133 S.Ct. at p. 522, citing *Loretto v. Teleprompter Manhattan CATV Corp*. (1982) 458 U.S. 419, 435, fn. 12 (*Loretto*).)  In *Loretto*, the court explained:  "Not every physical *invasion* is a taking.  . . . [S]uch temporary limitations are subject to a more complex balancing process to determine whether they are a taking.  The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." (*Loretto*, 458 U.S. at p. 435, fn. 12.)  Relevant in the temporary physical invasion context are not only the three aforementioned primary factors, but also the duration of the invasion, the character of the land at issue, and the severity of the interference with the owner's rights in the parcel as a whole.  (*Arkansas Game*, 133 S.Ct. at pp. 522-523, citing

11

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 342 ["duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim"]; *Penn Central*, *supra*, 438 U.S. at pp. 130-131 [the court "focuses . . . both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole"]; *Portsmouth Harbor Land & Hotel Co. v. United States* (1922) 260 U.S. 327, 329-330 ["[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [a taking]. Every successive trespass adds to the force of the evidence"].)

B. *The Entry Statutes*

Sections 1245.010 through 1245.060 are contained in chapter 4 of title 7 of the Code of Civil Procedure, otherwise known as the Eminent Domain Law. (§ 1230.010.) Section 1245.010 provides: "Subject to requirements of this article, any person authorized to acquire property for a particular use by eminent domain may enter upon property to make photographs, studies, surveys, examinations, tests, soundings, borings, samplings, or appraisals or to engage in similar activities reasonably related to acquisition or use of the property for that use." Where the entry and activities subject that person to liability for actual damage or substantial interference with the possession or use of the property (see § 1245.060), the condemnor must, before making its entry and undertaking these activities, secure either: (1) the written consent of the owner to enter on the property and to undertake the activities; or (2) an order for entry from the superior court. (§ 1245.020.)

On a petition for an entry order, "the court shall determine the purpose for the entry, the nature and scope of the activities reasonably necessary to accomplish such purpose, and the probable amount of compensation to be paid to the owner of the property for the actual damage to the property and interference with its possession and use. [¶] . . . After such determination, the court may issue its order permitting the entry. The order shall prescribe the purpose for the entry and the nature and scope of the activities to be undertaken and shall require the person seeking to enter to deposit with the court the probable amount of compensation." (§ 1245.030, subds. (b), (c).) The court may modify any of the provisions of this order after notice and hearing. (§ 1245.040, subd. (a).)

If the entry and activities cause actual damage or substantial interference with the property's possession or use, the owner may recover for such damage or interference either in a civil action, or by applying to the court to recover from the funds on deposit, which are retained for six months following the entry unless extended by the court for good cause. (§§ 1245.050, subd. (a); 1245.060, subd. (a).) When an owner applies to the court to recover funds on deposit, the court determines and awards the amount the owner is entitled to recover from those funds. (§ 1245.060, subd. (c).) If the deposit is insufficient to pay the full amount of the award, the court may enter judgment for any unpaid portion. (§ 1245.060, subd. (c).) The statute does not affect the availability of "any other remedy the owner may have for the damaging of his property." (§ 1245.060, subd. (d).)

13

Because the entry statutes are within the eminent domain law, and provide for a remedy that is not obtained by filing a complaint or suit in equity, a section 1245.020 petition for an entry order constitutes a special proceeding in eminent domain. (See §§ 21, [the two classes of judicial remedies are actions and special proceedings], 22 ["action" defined] & 23 ["special proceeding" defined]; *Cornette v. Department of Transp.* (2001) 26 Cal.4th 63, 76; *Greenfield v. Superior Court* (2003) 106 Cal.App.4th 743, 748 ["special proceedings 'are limited to cases that [are] neither actions at law nor suits in equity' "].)

III. *Neither District's Proposed Action Nor the Court's Order Violate the Entry Statutes or the California Constitution*

Young's contends the superior court's order must be set aside because District has not followed the Eminent Domain Law. It repeats its argument that the "[e]ntry [s]tatutes . . . authorize privileged entries onto property only for 'innocuous' and 'superficial' inspections prior to condemnation"; that the entry statutes must be applied within the confines of the California Constitution and "cannot serve as an end run" around the prohibition against taking or damaging for public use without just compensation (Cal. Const., art. I, § 19). According to Young's, District's petition is an unconstitutional overreach because it gives it an "unfettered right to occupy the property in its entirety for a period of 60 days or more, all while drilling some 46 borings and an unlimited number of samples throughout the property, with no restrictions whatsoever on the time, place, equipment, safety protocols, or other components necessary to enable Young's . . . , or its tenant K-1, to use their property."

14

Young's bases its arguments on *Jacobsen*, *supra*, 192 Cal. 319, the California

Supreme Court's 1923 case decided under a prior version of the California Constitution

and the predecessor to the entry statutes, former section 1242, which permitted the state

to enter land to "make examinations, surveys and maps . . . ."[6] Young's contends

*Jacobsen* demonstrates the District's entry order is not permissible under the current entry

statutes.  As we will explain, we disagree.

In *Jacobsen*, a municipal water district sought to enter land and conduct

excavations and testing for the purpose of determining the land's suitability for dams and

reservoirs.  (*Jacobsen*, *supra*, 192 Cal. at pp. 321-322.)  The landowners used their

properties for dairy farming and crop cultivation, and refused the water district

---

[6]    Former section 1242 provided:  "In all cases where land is required for public use, the state, or its agents in charge of such use, may survey and locate the same; but it must be located in the manner which will be most compatible with the greatest public good and the least private injury, and subject to the provisions of section twelve hundred and forty-seven.  The state, or its agents in charge of such public use, may enter upon the land and make examinations, surveys, and maps thereof, and such entry shall constitute no cause of action in favor of the owners of the land, except for injuries resulting from negligence, wantonness, or malice."  (See *Jacobsen*, *supra*, 192 Cal. at pp. 328-329.)  When *Jacobsen* was decided, then article I, section 14 of the California Constitution provided in part:  "[I]n an action in eminent domain brought by the state, or a county, or a municipal corporation, or a drainage, irrigation, levee, or reclamation district, the aforesaid state or political subdivision thereof or district may take immediate possession and use of any right of way required for a public use whether the fee thereof or an easement therefor be sought upon first commencing eminent domain proceedings according to law in a court of competent jurisdiction and thereupon giving such security in the way of money deposits as the court in which such proceedings are pending may direct, and in such amounts as the court may determine to be reasonably adequate to secure to the owner of the property sought to be taken immediate payment of just compensation for such taking and any damage incident thereto, including damages sustained by reason of an adjudication that there is no necessity for taking the property, as soon as the same can be ascertained according to law."

15

permission. (*Id*. at p. 321.) In a superior court action to enjoin the owners from preventing the work, the water district described the work as installing a boring rig, boring of test holes from 3 to 8 inches in diameter to the depth of 150 feet or more, and digging test pits of about 4 by 6 feet up to a 15-foot depth. (*Id*. at p. 322.) The work required four men for a period of about 60 days, with occasional visits by officials, and the water district alleged it would trample and destroy some growing crops. (*Id*. at pp. 322-323.) The water district proposed to fill the holes and excavations to restore the land to its original condition. (*Id*. at p. 323.) The superior court issued an order for a temporary injunction permitting the water district to proceed with the work, and ordered it to deposit $1,000 as security for damages. (*Id*. at pp. 323-324.)

On appeal, the water district contended that its actions would not amount to an unconstitutional taking, but was expressly permitted by former section 1242. (*Jacobsen*, *supra*, 192 Cal. at p. 324.) The California Supreme Court disagreed. It reviewed California case law dealing with then Article I, section 14 of the California Constitution. (*Jacobsen*, at p. 326.) The court held that the proposed activities amounted to an invasion of the owners' property rights under the provisions of the California Constitution: "It is idle to attempt to argue that such entry, occupation, disturbance, and destruction of the properties . . . would not constitute such an interference with their exclusive rights to the possession, occupation, use, and enjoyment of their respective holdings as would amount to a taking and a damaging thereof to the extent and during the period of such entry upon said lands and of the operations of the [water district] thereon." (*Jacobsen*, at p. 328.)

16

As for former section 1242, the court held:  "[W]hatever entry upon or examination of private lands is permitted by the terms of this section cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property.  Any other interpretation would . . . render the section void as violative of the foregoing provisions of both the state and federal Constitution."  (*Jacobsen*, *supra*, 192 Cal. at p. 329.)

For several reasons, *Jacobsen*, *supra*, 192 Cal. 319 does not compel the conclusion Young's urges us to draw.  The entry statutes today are unlike former section 1242, the statute under which *Jacobsen* invalidated the court's order.  The present entry statutes provide for a an eminent domain proceeding by which a petitioner is authorized to conduct a broader range of examinations, including "tests," "borings" and "samplings." Indeed, the entry statutes authorize only temporary entries for the limited purpose of engaging in "activities reasonably related to acquisition or use of the property" for the particular use that the property is to be acquired by eminent domain.  (§ 1245.010.)  And, unlike former section 1242, which had no provision for damages other than for negligent, willful, or malicious conduct (see footnote 6, *ante*), the proceeding under the current entry statutes contains a means by which compensation is paid to the landowner.  If the landowner does not agree to the entry, the petitioner uses this eminent domain proceeding to obtain an order in which the court establishes the probable amount of compensation, deposits that amount with the court, and disburses the money on the owner's application.

17

(§§ 1245.030-1245.060.)  The court may increase the deposit, if necessary, and stay the activities until that amount is deposited.  (§ 1245.040.)  And, if the deposited amount is insufficient to cover any damage or interference, the entry statutes permit the court to enter judgment for any unpaid portion or leave the owner free to seek "any other remedy" for property damage.  (§ 1245.060, subds. (c), (d).)

Such a proceeding is precisely what is permitted under the California Constitution, article 1, section 19's second clause, that is, an eminent domain proceeding with a deposit of a court-determined amount of compensation prior to entry:  "The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."  (Cal. Const., art. I, § 19.)  Nor does this proceeding run afoul of the federal Constitution's mandate that private property shall not "be taken for public use, without just compensation."  (U.S. Const., 5th Amend.)  As we explain below, the District's activities do not amount to a taking.

Furthermore, *Jacobsen*, *supra*, 192 Cal. 319, is factually distinct.  Accepting the facts and drawing all inferences in favor of the superior court's order as we must, we observe Young's indeed mischaracterizes the timing and extent of District's work.  Contrary to the assertion by Young's that the superior court's entry order "prevent[s] [it] from using the property indefinitely" or contains "virtually no restrictions on the access," the record shows District's proposed work is temporary and restricted in scope: taking only between eight and 10 business days to complete without totally occupying the property, as much of the work is conducted outside the building's footprint in a parking

18

lot, with three persons boring a limited number of 2-by 6-inch holes for soil and groundwater sampling, which holes will be filled and restored with sand or grout at the conclusion of the tests. District does not claim any continuing interest or right to the property, and Young's is free to possess, access or dispose of the property (including the sand and grout used to fill the bore holes) and any portion of it after the completion of the work. Thus, the District's entry is strictly temporary for the purpose of conducting the designated tests and sampling. As District points out, the water district's testing in *Jacobsen* was to take a much longer period of time (60 days) and was more burdensome and invasive, as it included digging large 4-by 6-foot test pits, and boring more than 150 feet deep below the surface, which the water district admitted would damage the owners' growing crops. In this case, District does not admit that its testing will substantially interfere with the use or enjoyment of the property. And in *Jacobsen*, the water district proceeded via an action for injunctive relief, rather than by an eminent domain proceeding, which article 1, section 14 of the California Constitution then required for preliminary occupations. (Footnote 6, *ante*.)

Finally, *Jacobsen*'s takings analysis was well before *Penn Central* and other authorities that have developed the law on takings. Thus, the *Jacobsen* court necessarily did not engage in the fact-specific inquiry necessary to assess whether a temporary physical invasion—as is proposed here—constitutes a compensable taking or damaging of property. Nor did the court conduct any such analysis in *County of San Luis Obispo v. Ranchita Cattle Company* (1971) 16 Cal.App.3d 383 relied on by Young's as "reaffirming" *Jacobsen*. *Ranchita* is dicta on its discussion of *Jacobsen* in any event, as

19

it involved the scope of a property owner's *written right of access agreement* with a flood control district to enter for testing; the court observed that the access agreement was so general and imprecise that it gave the district no more than a right of entry for surveys and maps. (*Ranchita*, 16 Cal.App.3d at pp. 386-389.) The discussion of *Jacobsen* was ultimately unnecessary to the Court of Appeal's holding, which was that the property owner was barred from recovering any such damages because it did not file a claim for damages based on its assertion that the district's actions went beyond their agreement and constituted a trespass. (*Ranchita*, at pp. 389-390.) In sum, neither *Jacobsen* nor *Ranchita* compel us to conclude that District's proposed testing, boring and sampling runs afoul of the entry statutes or renders them unconstitutional.[7]

---

[7] Young's further argues that *Jacobsen* and *Ranchita* are in accord with "longstanding" out-of-state authorities. We are not bound to follow out-of-state decisions. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 490.) But these decisions are distinguishable in any event. In *Hendler v. U.S.* (Fed.Cir. 1991) 952 F.2d 1364, the court found a permanent physical taking where the Environmental Protection Agency had installed 100-foot deep monitoring wells lined with plastic and stainless steel, surrounded by gravel and cement, capped with a cement casing lined with reinforced steel, and enclosed by a railing of steel pipe set in cement. (*Id*. at pp. 1375-1376.) The first of such wells had had been in place for "years." (*Ibid*.) *Hendler* rests on the permanency of the wells, as well as regular government intrusions to monitor them. (*Id*. at p. 1376.) In *Burlington Northern and Santa Fe Railway Co. v. Chaulk* (Neb. 2001) 631 N.W.2d 131, the Nebraska Supreme Court reviewed the language of a specific state statute authorizing a precondemnation entry, and held it permitted only " 'examining and surveying,' " not the type of core drilling sought to be conducted by the railroad, and thus the tests exceeded the statutory authority under the statute's plain meaning. (*Id*. at pp. 138-140.) In *Kane County v. Elmhurst Bank* (Ill.App. 1982) 443 N.E.2d 1149, the court likewise was addressing a particular statute permitting the county to "mak[e] surveys" and held that it did not permit subsurface soil and geological studies. (*Id*. at p. 1151.) In stating further that a precondemnation entry order for testing or surveying may not allow a taking, the *Kane County* court relied in part on *Jacobsen* and *Ranchita* (*Kane County*, at pp. 1153-1154), which as we have stated above are not persuasive on the issue. And, we

Young's does not argue that the entry statutes are facially constitutionally invalid.

Indeed, it cannot raise a facial challenge, as it concedes the entry statutes authorize some entries onto property before condemnation. A facial challenge " 'considers only the text of the measure itself, not its application to the particular circumstances of an individual.' " (*In re Taylor* (2015) 60 Cal.4th 1019, 1039, fn. 9.) In such case, the challenger "must establish that *no set of circumstances exists under which the [statute] would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid . . . ."* (*People v. Hatch* (2000) 80 Cal.App.4th 170, 192-193; see also *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [to demonstrate facial unconstitutionality, petitioners must demonstrate that the act's provisions " ' "inevitably pose a present total and fatal conflict with applicable constitutional prohibitions" ' "].) Though Young's suggests a broad application of the entry statutes to it would be unconstitutional because District's conduct constitutes a taking, it does so based on *Jacobsen*, without any legal analysis or separate heading asserting an as applied challenge. An as applied challenge " 'contemplates analysis of the facts of a particular case . . . to determine the circumstances in which the statute . . . has been applied and to consider whether in those particular circumstances the application

observe there is authority to the contrary. (See *City of Northglenn v. Grynberg* (Colo. 1993) 846 P.2d 175, 182 [drilling of 600-foot test hole did not rise to the level of a taking, though it was a physical invasion, as the "drilling itself did not interfere with [the cross-petitioner's] use, possession, enjoyment, or disposition of his coal lease" and it was "a single, transitory physical invasion of [the] coal lease" which did not translate to an exercise of dominion and control of the lease].)

deprived the individual to whom it was applied of a protected right.' " (*In re Taylor*, 60 Cal.4th at p. 1039, italics omitted.)

Notwithstanding the absence of a square as-applied constitutional challenge, we conclude below that such a claim would nevertheless fail because District activities do not rise to the level of a taking requiring a jury determination of just compensation. We address and reject below the arguments of Young's to the contrary.

IV. *District's Proposed Actions Do Not Effect a Per Se Taking*

Young's contends that in addition to constituting a substantial invasion of its property rights, District's proposed boring and sampling constitutes an "obvious 'permanent physical occupation' " regardless of the size or value of the property. Young's relies on *Loretto*, *supra*, 458 U.S. 419, in which a state law required landlords to permit cable companies to install cables and large cable boxes on the roof and sides of apartment buildings, a "direct physical attachment of plates, boxes, wires, bolts and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall." (*Id*. at pp. 421-422, 438.) Characterizing its decision as "very narrow" (*id*. at p. 441), the *Loretto* court held this constituted a "permanent physical occupation," which effects "a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only a minimal impact on the owner." (*Id*. at pp. 434-435.) *Loretto* thus involved a situation where, as the court described it, the government "chops through" *each* " 'strand' from the 'bundle' of property rights . . . taking a slice of every strand." (*Id*. at p. 435.) Such an occupation "forever denies the owner any power to control the use of the property; he not only

22

cannot exclude others, but can make no nonpossessory use of the property." (*Id*. at p. 436.) More recently, the U.S. Supreme Court held that a physical taking akin to *Loretto* had occurred under a government program that required raisin growers to physically set aside a portion of their crop to a United States government entity, the Raisin Administrative Committee, free of charge. (*Horne v. Department of Agriculture*, *supra*, 135 S.Ct. at pp. 2424, 2428-2429.) There, title to the raisins passed to the Committee, and the Committee "disposes of what become its raisins as it wishes," thus causing the growers to lose the entire "bundle" of property rights in the appropriated raisins. (*Horne*, 135 S.Ct. at p. 2428.)

The record here shows no such permanent physical occupation that "forever denies [Young's] any power to control the use of [its] property." (*Loretto*, *supra*, 458 U.S. at p. 436.) District's activities are arranged to ensure Young's is not completely divested of its property rights; the land is not permanently occupied in any sense as District's testing involves sampling minimal amounts of building surfaces (described by Bestard as "less than the size of a postage stamp"), disturbing two-inch to six-inch diameter portions of the land in order to take soil and groundwater samples, and refilling the holes with sand or bentonite grout. The testing does not require access to the entirety of the property, and will be completed in a maximum of ten business days. After that time, District does not claim any property right, recurring right to enter, or right to continually monitor the testing areas, as the cable companies presumably would monitor or service their permanently affixed cable boxes in *Loretto*, *supra*, 458 U.S. 419, or permanent

23

appropriation as the government committee did in *Horne v. Department of Agriculture*, *supra*, 135 S.Ct. 2419.

Rather, the challenged activities constitute a temporary and incidental disruption, which does not affect the property's suitability as a parking lot or indoor cart racing center. To the extent Young's claims the property's suitability for its present use is permanently or even temporarily impacted by the proposed boring and sampling, the claim is simply not supported by the factual record as to the scope of District's proposed work.

Because in opposition to District's petition Young's maintained District's actions amount to a permanent physical occupation, Young's did not apply the multi-factor test for a temporary physical invasion of property by the government. (*Arkansas Game*, *supra*, ___ U.S. ___ [133 S.Ct. at p. 522].) Thus, it did not develop a record or " 'bring the relevant factual situation sufficiently into controversy.' " (*Moerman v. State of California* (1993) 17 Cal.App.4th 452, 461.)[8]

Young's does not argue that its property will be "damaged" within the meaning of the California Constitution. District's testing—conducted on a paved lot involving bore holes that will be filled and repaired, or very small pieces of building materials taken

_____

[8]     Were we to apply that fact specific test, it would support our conclusion. The duration of District's entry on the property to conduct the testing is short, no more than ten business days. As for the character of the land affected, the portions impacted by the borings are paved and used for parking, and thus the severity of the interference in those portions of Young's property is minimal, and, after the holes are filled and repaired, nonexistent. That is equally the case with the de minimus postage-size stamp samples of building materials to be removed for asbestos testing.

from unobtrusive places—is not comparable to cases involving property damage amounting to a taking. (See, e.g., *City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 222 [citing cases in which a taking resulted when a construction of a sewer caused compaction of soil and damage to structures on plaintiffs' adjacent property; or when levees installed by a flood control district caused flooding on adjacent land; or a contractor piled earth, rock and other materials and erected sheds and temporary structures on plaintiffs' uncondemned property; or when an ordinance prohibited growing vegetation or erecting structures on plaintiff's property in order to keep airspace clear for nearby airport; or the construction of a railroad along the street in front of the plaintiff's home lowered the grade of the street and cut off the plaintiff's access].)

## V. *Amicus K-1's Arguments*

This court granted K-1 leave to file an amicus curiae brief on behalf of Young's. However, we address only those arguments that do not expand on the appellate issues raised by Young's. Thus, to the extent K-1 seeks to raise the necessary party issue or its own interests, we will not consider the arguments. (See *Connerly v. State* (2014) 229 Cal.App.4th 457, 463, fn. 6, citing *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1047, fn. 12.)

Our conclusions above resolve most of K-1's amicus arguments, including its contentions that the column of sand or filler "destroys Young's Holdings . . . right to possess, use, and dispose of that property to the extent of the column's size" and that the superior court's order gives District "an ongoing property interest in the holes . . . ." But

25

K-1 additionally argues that the order grants District a "profit à prendre," that is, an easement conferring the right to remove timber, gravel, minerals, oil, fish or wild animals from the land. "A *profit à prendre* has been defined as the 'right to make some use of the soil of another, . . . and it carries with it the right of entry and the right to remove and take from the land the designated products or profit and also includes right to use such of the surface as is necessary and convenient for exercise of the profit.' " (*Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1186.) As this court explained in *Kennecott*, such a profit interest "is a means by which a party may explore for and extract resources *until it chooses in its sole discretion to surrender its right to do so*." (*Kennecott Corp*, at pp. 1187-1188, italics added.) Here, the District's entry and "extraction" of materials is not so unlimited under the superior court's entry order, which incorporates District's description of the nature, scope and timing of the entry and testing in its petition.

And we reject K-1's argument that we must construe the superior court's order as "permitting 'the most injurious use of the property reasonably possible.' " K-1 maintains that if we construe the order in such a way, "there is nothing to stop the District from attempting to drill within the building where K-1 operates its go kart racing business." For this proposition, K-1 relies on *County of San Diego v. Bressi* (1986) 184 Cal.App.3d 112, which discusses a jury's determination of damages in a condemnation action: "The jury in a condemnation action must '. . . once and for all fix the damages, present and prospective, that will accrue reasonably from the construction of the improvement and in this connection [the jury] *must consider the most injurious use of the property reasonably possible*.' [Citation.] In determining the most injurious use of the property reasonably

26

possible, the jury must consider the entire range of uses permitted under the resolution of necessity." (*Id*. at p. 123.) *Bressi* was not decided in the context of the precondemnation entry statutes, under which the court determines the probable amount of compensation for associated injuries from the entry; the case addressed the respondent's evidentiary argument as to what evidence the jury could consider on retrial in a county's proceeding to condemn certain easements. (*Id*. at pp. 121-124.) *Bressi* has no bearing on the issues presented in this case.

In sum, District's activities do not violate either the entry statutes or the state or federal Constitution, and they do not amount to a taking requiring a jury determination of just compensation. The superior court did not err by granting District's petition for an entry order. Accordingly, we deny the writ petition.

DISPOSITION

The petition is denied. The stay issued on July 1, 2015, is vacated. San Diego Unified School District shall recover its costs of this writ proceeding.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.


27